UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| SONOMA SPRINGS LIMITED PARTNERSHIP, a Nevada limited partnership, and SONOMA SPRINGS ASSOCIATES, LLC, a Nevada limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a Maryland Corporation and ZURICH AMERICAN INSURANCE COMPANY OF ILLINOIS, a Maryland Corporation and DOES 1-20, inclusive,<br><br>Defendants. | Case No. 3:18-cv-00021-LRH-CBC<br><br>ORDER |

Defendants Fidelity and Deposit Company of Maryland ("Fidelity") and Zurich American Insurance Company of Illinois ("Zurich") (collectively "Surety" or "defendants") move this court for summary judgment. ECF No. 60. Sonoma Springs Limited Partnership and Sonoma Springs Associates, LLC (collectively "plaintiffs" or "Sonoma Springs") opposed the motion (ECF Nos. 69, 71) and defendants replied (ECF No. 73). The court now grants in part and denies in part defendants' motion.

///

///

///

///

1

## I. BACKGROUND

Sonoma Springs owns real property in Humboldt County, Nevada. ECF No. 2, Ex. A, ¶ 10. In June 2015, Sonoma Springs contracted with Ascent Construction, Inc. ("Ascent") to build an apartment complex on the property. *Id.* at ¶ 11. Ascent, as the contractor, was required to obtain a payment and a performance bond. *Id.* at ¶ 12. Ascent obtained two bonds. *Id.* at ¶ 13–16.

The parties executed the performance bond using the standard Document A312-2010 from the American Institute of Architects. ECF Nos. 61-1;[1] 71-5. Pursuant to the performance bond terms, Fidelity is listed as the Surety, Ascent is the Contractor, and Sonoma Springs Limited Partnership is the Owner. *Id.* Sections 3 through 6 of this bond are particularly relevant, providing how the owner invokes the Surety's obligation should the Contractor default, the obligations of the Surety if the Contractor defaults, the Owner's remedies, and the nature of damages available for default. *Id.*

The parties also executed the payment bond using the same Document A312-2010 form bond. ECF Nos. 61-2; 71-4. Pursuant to the payment bond terms, Fidelity is again listed as the Surety, Ascent the Contractor, and Sonoma Springs as the Owner. *Id.* Sections 2 through 5 of this bond are particularly relevant, providing when the Surety's obligation is fulfilled, how the owner invokes the Surety's obligations should the Contractor default, and the Surety's obligation under the contract. *Id.*

The Surety bound itself, jointly and severely with the Contractor under the express terms of the bonds, to Sonoma Springs to "pay for labor, materials and equipment furnished for use in the performance of the Construction Contract," and "for the performance of the Construction Contract." *See* ECF Nos.71-4; 71-5. Sonoma Springs alleges that Ascent breached the terms of the Construction Contract, triggering the Surety's obligations under both the performance and payment bonds. ECF No. 2, Ex. A ¶ 19. Contrarily, Ascent claims that Sonoma Springs breached the contract and sued Sonoma Springs in the Sixth Judicial District Court of the State of Nevada

---

[1] Defendants' payment and performance bond cover sheets appear to have been inadvertently switched—ECF No. 61-1 is the performance bond and ECF No. 61-2 is the payment bond. As these forms are based on the American Institute of Architects AIA form documents, the court is confident that this clerical labeling error does not affects its review of the evidence or its ruling herein.

for the County of Humboldt in May 2017. *See* ECF No. 30-1. In that action ("state court action"), Ascent asserted six claims: breach of contract, foreclosure of mechanic's lien, declaratory judgment for priority of encumbrances, violation of the implied covenant of good faith and fair dealing, unjust enrichment, and account stated. *Id.* Ascent also recorded a lien against the property. ECF No. 47 at 4. The lien has since been reduced by order of the state court (ECF No. 71-2) and substituted by a surety bond obtained from Hartford Fire Insurance Company (ECF No. 47 at 6).

After the contractual dispute arose between Sonoma Springs and Ascent, Sonoma Springs demanded multiple times that the Surety assume the contractual obligations they argue were required by the bonds. ECF No. 2, Ex. A ¶¶ 20–27. The demands were unsuccessful. *Id.* Thereafter, on December 18, 2017, Sonoma Springs filed suit against the Surety in the Sixth Judicial District Court of the State of Nevada for the County of Humboldt. *Id.* On January 12, 2018, defendants removed the action to this Federal Court. ECF No. 1. This suit includes thirteen claims, including breach of contract claims, tortious and contractual breach of the implied covenant of good faith and fair dealing claims, breach of fiduciary duty and bad faith claims, a claim for violation of Nevada's Unfair Claims and Settlement Practices Act, and claims for misrepresentation and unjust enrichment. ECF No. 2, Ex. A.

On March 5, 2018, the Surety moved to stay this action pending the outcome of the state court action between Ascent and Sonoma Springs (ECF No. 30); however, after finding that the *Colorado River* doctrine did not warrant a stay, the court denied the motion (ECF No. 53). Defendants now move this court for summary judgment arguing that plaintiffs' claims fail as a matter of law. ECF No. 60.

**II.    LEGAL STANDARD**

   **Motion for Summary Judgment Pursuant to Civil Procedure Rule 56**

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In assessing a motion for summary judgment,

the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quotation and citation omitted); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the nonmoving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient" to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the party. *See id.* at 252.

Surety bonds are contracts; as such the court interprets them pursuant to Nevada contract law. *United States for the Use and Benefit of Agate Steel, Inc., v. Jaynes Corporation*, Case No. 2:13-cv-01907-APG-NJK, 2016 WL 8732302, at *2 (D. Nev. June 17, 2016). In contract disputes, interpretation of the contract is a question of law with the objective of giving effect to the intent of the parties. *Am. First Fed. Credit Union v. Soro*, 359 P.3d 105, 106 (Nev. 2015). If the language of the contract is "clear and unambiguous," the contract should be given its plain

meaning and enforced as written. *Id.*; *see Intermec, Inc. v. IBM*, No. 11-165-BJR, 2014 WL 6472854, at *4 (W.D. Wash. Nov. 18, 2014) (quoting *Mellon Bank, N.A. v. United Bank Corp. of New York*, 31 F.3d 113, 115 (2d Cir. 1994) (summary judgment is appropriate "if the language of the contract is 'wholly unambiguous.'")). "A contract is ambiguous when it is subject to more than one reasonable interpretation." *Anvui, LLC v. G.L. Dragon, LLC*, 163 P.3d 405, 407 (Nev. 2007). However, a contract is not deemed ambiguous simply because the parties disagree on how to interpret it. *Galardi v. Naples Polaris, LLC*, 301 P.3d 364, 366 (Nev. 2013); *United States v. King Features Entm't, Inc.*, 843 F.2d 394, 398 (9th Cir. 1988) ("Summary judgment is appropriate when the contract terms are clear and unambiguous, even if the parties disagree as to their meaning.").

## III.   DISCUSSION

### A. Removal was proper and the court has subject matter jurisdiction over this action.

Civil actions brought in state court may be removed to the United States District Court of the district or division that embraces the state court if the district court has original jurisdiction. 28 U.S.C. § 1441(a). This court has "original jurisdiction"—there is complete diversity between the parties[2] and the amount in controversy exceeds $75,000.00.[3] *See* 28 U.S.C. § 1332.

Removal was likewise timely: defendants were originally served with the summons and complaint on December 19, 2017, via the Nevada Department of Business and Industry, Division of Insurance, and later served on CSC on December 26, 2017. ECF Nos. 1; 2, Ex. B. Defendants filed a notice of removal on January 12, 2018, and on January 16, 2018, filed the required civil cover sheet and paid the filing fee. ECF Nos. 1, 11, 12. As removal was complete within 30 days

---

[2] Plaintiffs are citizens of Nevada and Idaho. The named defendants are citizens of Maryland and Illinois. The citizenship of the fictitious "Doe" defendants named in the complaint are not considered for purposes of assessing proper removal based on diversity jurisdiction. 28 U.S.C. § 1441(b)(1); *see also Bryant v. Ford Motor Co.,* 886 F.2d 1526, 1528 (9th Cir. 1989) *cert. denied,* 493 U.S. 1076 (1990).

[3] Pursuant to Nevada Rule of Civil Procedure 8, the complaint filed in state court only requested damages "in excess of $15,000." However, it is "facially apparent" from the complaint that the jurisdictional amount in controversy requirement is met. *Singer v. State Farm Mut. Auto. Ins. Co.,* 116 F.3d 373, 377 (9th Cir. 1997). First, plaintiffs' demand letter to defendants of July 5, 2017, detailed an amount in controversy of $260,000. ECF No. 61-5. Second, this cause of action largely centers around whether defendants were required to bond off Ascent's lien of $231,850.86 against the property. ECF Nos. 2, Ex A; 71-2.

of either December 19 or 26, 2017, defendant's notice of removal was timely under 28 U.S.C. § 1446(b).

**B. Plaintiffs' second cause of action for breach of the performance bond fails because the conditions precedent to trigger the Surety's obligation were not satisfied.**

A performance bond creates a unique three-party relationship where the surety guarantees that in the event the principal (here, Ascent) defaults on its obligations in the underlying construction contract, the surety will step in and perform. *See* 17 Am. Jur. 2d *Contractors' Bonds* § 1 (2019). Performance bonds are not insurance and do not indemnify the contractor, but rather, the bonds simply protect the owner. *Id.* Performance bonds specify conditions precedent that the owner must complete prior to invoking the surety's obligations under the bond. *See* 1 Christopher R. Ward, Brett D. Divers, Matthew M. Horowitz, and Kevin L. Lybeck, *New Appleman on Insurance Law Library Edition* § 139.01 (2019) ("*New Appleman*"). Traditionally, courts have found that an owner's failure to comply with these conditions is fatal to an owner's claim. *See e.g., Jaynes*, 2016 WL 8732302, at *7-8; *Stonington Water St. Assoc., LLC v. Hodess Bldg. Co.*, 792 F. Supp.2d 253, 262-63 (D. Conn. 2011) ("[C]ompliance with the conditions precedent is necessary in order to invoke the surety's obligation under the performance bond and failure to do [so] is fatal to the obligee's claim for coverage."); *CC-Aventura, Inc. v. Weitz Co., LLC*, 492 Fed.Appx. 54, 56-57 (11th Cir. 2012) (the obligee was required to "first give notice to the surety before [it] undertook to remedy the default itself," and therefore, the surety was not liable on the bond); *L & A Contracting Co. v. S. Concrete Servs.*, 17 F.3d 106, 111 (5th Cir 1994)) ("A declaration of default sufficient to invoke the surety's obligations under the bond must be made in clear, direct, and unequivocal language. The declaration must inform the surety that the principal has committed a material breach or series of material breaches of the subcontract, that the obligee regards the subcontract as terminated, and that the surety must immediately commence performing under the terms of the its bond."); *Hunt Constr. Grp., Inc. v. Nat'l Wrecking Corp.*, 542 F. Supp.2d 87, 95 (D.D.C. 2008) ("When an obligee fails to provide timely notice to a surety so it can exercise its options . . ., the obligee has breached the contract and the surety is without liability.").

Here, the parties' performance bond, which conforms with the American Institute of Architects AIA Document 312-2010,[4] provides the following conditions precedent:

> **§ 3** If there is no Owner Default under the Construction Contract, the Surety's obligation under this Bond shall arise after
> **.1** the Owner first provides notice to the Contractor and the Surety that the Owner is considering declaring a Contractor Default. Such notice shall indicate whether the Owner is requesting a conference among the Owner, Contractor and Surety to discuss the Contractor's performance. If the Owner does not request a conference, the Surety may, within five (5) business days after receipt of the Owner's notice, request such a conference. If the Surety timely requests a conference, the Owner shall attend. Unless the Owner agrees otherwise, any conference requested under this Section 3.1 shall be held within ten (10) business days of the Surety's receipt of the Owner's notice. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default;
> **.2** the Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety; and
> **.3** the Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.
>
> **§ 4** Failure on the part of the Owner to comply with the notice requirement in Section 3.1 shall not constitute a failure to comply with a condition precedent to the Surety's obligations, or release the Surety from its obligations, except to the extent the Surety demonstrates actual prejudice.

ECF No. 71-5.

The parties dispute, and the issue is currently being litigated in state court, whether the first condition is met—was the Owner in default under the terms of the construction contract. Under the performance bond, owner default is defined as "[f]ailure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract." *Id.* §14.4. From the plain language of the bond, if the owner was in default, the Surety was under no obligation to perform on the bond.

---

[4] This form bond was initially crafted in 1984 and the majority of the case law surrounds this version. The 2010 version, at issue here, differs some from the 1984 version, including not requiring a conference be held and that failure to provide notice does not automatically extinguish the owner's claim against the surety. *See New Appleman*, § 139.02(3)(c).

However, additional conditions precedent must also have been satisfied by the plaintiffs to trigger the Surety's obligation under the bond. First, Sonoma Springs was to provide notice to Ascent and the Surety that it was considering declaring Contractor Default. Plaintiffs also were required to declare Contractor Default, terminate the Construction Contract,[5] and notify the Surety. And finally, the Owner was required to agree to pay the Balance of the Contract Price to the Surety. By the bond's plain language, the parties agreed that a failure to comply with § 3.1 does not automatically release the Surety from its obligation unless the Surety can show actual prejudice. *Id.* § 4. However, § 4 specifically excludes §3.2 or §3.3 from this provision; therefore, a failure to comply with one of these sections "is a material breach that renders the bond null and void." *Jaynes*, 2016 WL 8732302, at *7.

The record shows that plaintiffs declared Ascent in default and gave notice to the Surety of this fact. In an email from plaintiffs' counsel to defendants' counsel on June 6, 2017, plaintiffs' counsel stated, "As delineated in our telephone conversation, past conversations, and written documentation, the Contractor is in default," and demanded the Surety step in to carry out the terms of the Construction Contract. ECF No. 61-3. In further correspondence on the issue from June 9, 2017, plaintiffs' counsel stated that it had previously "tendered to the Surety the claims and Owner's position/defenses addressing Ascent's performance, lack of performance, delayed performance." ECF No. 61-5, Ex. 1. Plaintiffs articulated that by recording its lien against the property, Ascent was in breach of the Construction Contract. *Id.* This letter does specifically reference "default," but the court would note that plaintiffs use the term

---

[5] Under the terms of the Construction Contract, the Contract "may be terminated by the Owner or the Contractor as provided in Article 14 of AIA Document A201-2007." ECF No. 75-1 at 6. Section 14.2.1 provides:
> The Owner may terminate the Contract if the Contractor
> **.1** repeatedly refuses or fails to supply enough properly skilled workers or proper materials;
> **.2** fails to make payment to Subcontractors for materials or labor in accordance with the respective agreements between the Contractor and the Subcontractors;
> **.3** repeatedly disregards applicable laws, statutes, ordinances, codes rules and regulations, or lawful orders of a public authority; or
> **.4** otherwise is guilty of a substantial breach of a provision of the Contract Documents.

*Id.* at 73.

interchangeably with breach.[6] The record also shows that plaintiffs agreed to pay the balance of the construction price to the Surety: "Please remember, the Owner will tender payment immediately for the unpaid balance within the Construction Contract terms, once Ascent complies with the Contract terms." *Id.*

While this correspondence may meet §3.3 and a portion of the §3.2 condition of the performance bond—specifically, declaration of a Contractor Default—the record is devoid of any indication that plaintiffs terminated the construction contract as required under the bond. This is fatal to plaintiffs' claim. *See Jaynes*, 2016 WL 8732302, at *8 ("Janyes failed to comply with the condition precedent in section 3.2 of the performance bond and its failure to do so is a material breach that excuses Ohio Casualty's performance."); *Stonington*, 792 F. Supp.2d at 267 (The obligee's "failure to terminate [the Contractor] when reason to do so arose and then to properly comply with the notice procedures set forth . . . is a material breach of the bond and underlying contract."). Plaintiffs failed to satisfy the §3.2 condition precedent, and that failure was a material breach of the performance bond that excuses the Surety's obligation. Accordingly, the court grants summary judgment as to plaintiffs' second cause of action.

### C. The court grants defendants' motion for summary judgment on plaintiffs' fourth, fifth, eighth, ninth, and tenth causes of action for tortious breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, bad faith, and violation of NRS § 686A.310.

In 1975, the Nevada Supreme Court first approved and adopted a cause of action in tort for breach of an implied covenant of good faith and fair dealing. *U.S. Fidelity & Guaranty Co. v. Peterson*, 540 P.2d 1070, 1071 (Nev. 1975). The *Peterson* Court held that "where an insurer fails to deal fairly and in good faith with its insured by refusing without proper cause to compensate its insured for a loss covered by the policy such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing." *Id.* Subsequently,

---

[6] The court notes that, "[n]ot every breach of a construction contract, not even every material breach, constitutes a default under the contract as to justify termination and the involvement of a surety, if there is one. A default which would involve the surety is believed to require a material breach or series of breaches which are sufficient to justify termination of the contract by the owner/obligee." *L & A Contracting Co.*, 17 F.3d at 110 n. 11 (quoting James A. Knox, *Representing the Private Owner*, in Construction Defaults: Rights, Duties, and Liabilities § 9.3, at 201 (Robert F. Cushman & Charles A. Meeker eds., 1989)).

9

the Nevada Supreme Court has limited application of tort liability under the covenant. *See e.g.*, *Aluevich v. Harrah's*, 660 P.2d 986, 986 (Nev. 1983) (declining to extend the tort claim to "commercial leases between two sophisticated parties who are not otherwise bound by a special element of reliance or fiduciary duties.").

The Nevada Supreme Court has explicitly declined to extend liability to a surety for the tortious breach of the covenant. *See Great American Ins. Co. v. General Builders, Inc.*, 934 P.2d 257, 263 (Nev. 1997) (After the surety's revocation of the contractor's bonds, the project owner declined to award the contract to the contractor. On these facts, the court determined that "this case [does] not raise the same public policy concerns implicated where an insurance company refuses to compensate a policyholder for losses covered by the policy;" therefore, punitive damages were not appropriate.); *Insurance Co. of West v. Gibson Tile Co., Inc.*, 134 P.3d 698, 702 (Nev. 2006) (The general contractor required its subcontractor take out a bond on the project. Because the subcontractor "transacted most of its business with [the surety] through a bond agent," and the parties had equal bargaining power, the Court held that, as a matter of law, the subcontractor and the surety had no special relationship that would allow a tortious breach of the covenant of good faith and fair dealing claim.). While the Nevada Supreme Court's rulings have been confined to cases by a principal against a surety, this District has held that the Court's rulings extend broadly to all tortious bad faith claims against sureties. *See e.g., Clark County Sch. Dist. v. Travelers Cas. And Sur. Co. of Am.*, Case No. 2:13-cv-01100-JCM-PAL, 2015 WL 139399, at *3-4 (D. Nev. Jan. 12, 2015), *denied reconsideration and denied certifying question to the Nevada Supreme Court*, 2015 WL 1578163, at *3-6 (April 8, 2015) ("*Travelers II*") (declining to confine *Gibson Tile* and *General Builders* to plaintiffs reasoning because "reading these cases to bar all tortious bad faith claims against sureties conforms with the Nevada Supreme Court's broad language and reasoning presented" in these cases.).

The court agrees and finds that under Nevada law, plaintiffs' claims for tortious breach of the implied covenant of good faith and fair dealing fail because, as a matter of law, these claims are not maintainable against a surety. *See Gibson Tile*, 134 P.3d at 702 ("A surety cannot be liable for the tortious breach of the covenant of good faith and fair dealing."); *General*

*Builders*, 934 P.2d at 263 (finding no special relationship between the contractor and the surety that would support a claim for tortious breach of the covenant). The Nevada Supreme Court's broad language in *Gibson Tile* must be read as prohibiting tort liability for bad faith against the surety by both the principal and the obligee. *Gibson Tile*, 134 P.3d at 702. Had the Court wished to limit its ruling to claims by a principal against a surety it would have done so. *See Travelers II*, 2015 WL 1578163, at *4.

Further, there is a similar factual basis here as in *Gibson Tile* and *General Builders* that supports finding plaintiffs' claims for tortious breach are inapplicable—the owner-surety relationship simply does not raise the same public policy concerns implicated in *Fidelity*. *See General Builders*, 934 P.2d at 263. Here, unlike most insurance contracts, the parties are both sophisticated—one an owner of a multi-million-dollar project and the other a national surety. *See Aluevich*, 660 P.2d at 987. Moreover, one party did not hold "vastly superior bargaining power"—the parties used a form performance bond and payment bond used routinely by parties in these relationships. *See id*; *General Builders*, 934 P.2d at 263 ("[T]he parties, both experienced commercial entities . . . were never in inherently unequal bargaining positions."); *Travelers II*, 2015 WL 1578163, at *4-5 ("[U]nlike in cases of insurance, surety bonds are by no means 'adhesion contracts.' . . . Indeed, the obligee may have an even weaker argument than the principal to sue a surety for tortious bad faith, as the obligee was not even a contracting party to the bonds obtained by the principal."). Accordingly, plaintiffs' fourth and fifth claims fail as a matter of law.

Additionally, "because a surety's role in providing bonds on behalf of a principal is distinct from that of an insurance company providing a policy to protect its insured, a surety is not held to owe the same fiduciary duty . . .." *Gibson Tile*, 134 P.3d at 703 (finding the lower court erred in instructing the jury that the surety owed a fiduciary duty to the principal). "[A] surety simply lends its credit and agrees to step in where the principal defaults on its contract. This is not a fiduciary relationship, and therefore does not present the same concerns as the insured-insurer relationship." *Travelers II*, 2015 WL 1578163 at *5. Accordingly, plaintiffs' eighth cause of action for breach of fiduciary duty must also fail.

Similarly, NRS § 686A.310, *Unfair practices in settling claims; liability of insurer for damages*, is a statute pertaining directly to insurers, not sureties. This statute, part of what is commonly referred to as the Unfair Insurance Practices Act (NRS § 686A.010 *et seq.*), was enacted for the benefit of insured persons against insurers. *See Crystal Bay Gen. Imp. Dist. v. Aetna Cas. & Sur. Co.*, 713 F. Supp. 1371, 1376 (D. Nev. 1989), *rev'd in part on other grounds*, No. 90-16417, 959 F.2d 239, 1992 WL 68269 (9th Cir. April 7, 1992) (unpublished). The legislative history, provides that the sponsor of A.B. 811, which amended the statute in 1987, stated that the statute "would benefit the people of Nevada by *codifying existing law* that was recognized as common law in the sense of the right of a person to sue his insurance company for an act of bad faith." *Crystal Bay*, 713 F. Supp. at 1376 (quoting Minutes of Nevada State Legislature Assembly Committee on Commerce, May 25, 1987) (emphasis in original). While this District subsequently held that it was not the intent of the Nevada Legislature to codify the common law tort of bad faith, the two do overlap. *See Hart v. Prudential Prop. & Casualty Ins. Co.*, 848 F. Supp. 900, 904-05 (D. Nev. 1994).

Specifically, the statute applies more narrowly than the common law tort: the statute is limited to proscribing "specific actions taken by an *insurer*," while the Nevada Supreme Court has allowed tortious bad faith claims to proceed in actions dealing with partnerships, insurance, and franchise agreements. *See id.* at 904 (emphasis added); *Aluevich*, 660 P.2d at 987. As the court has articulated above, the surety-owner relationship is distinguishable from that of the insurer-insured relationship, and the court will not simply apply insurance law in the surety context. Consequently, defendants cannot not be held to have violated a statute intended to benefit the insured when plaintiffs are an owner in a surety relationship. For the same reasons, plaintiffs' claim for bad faith must also fail. *See Ming Chu Wun v. North Am. Co. for Life and Health Ins.*, Case No. 3-11-cv-00760-KJD-CWH, 2012 WL 893750, at *4 (D. Nev. March 15, 2012) ("Nevada's definition of bad faith is (1) *insurer's* denial of (or refusal to pay) an *insured's* claim (2) without any reasonable basis and (3) the *insurer's* knowledge or awareness of the lack of any reasonable basis to deny coverage, or the *insurer's* reckless disregard as to the

unreasonableness of the denial." (emphasis added)). Accordingly, plaintiffs' ninth and tenth causes of action for bath faith and violation of NRS § 686A.310 must fail as a matter of law.

Therefore, for all of the above reasons, the court grants defendants' motion for summary judgment as to plaintiffs' fourth, fifth, eighth, ninth, and tenth causes of action.

**D. The court grants defendants' motion for summary judgment on plaintiffs' seventh cause of action for breach of the implied covenant of good faith and fair dealing under contract law.**

Distinct from the tort discussed above, all contracts, including commercial contracts, "impose upon the parties an implied covenant of good faith and fair dealing, which prohibits arbitrary or unfair acts by one party that work to the disadvantage of the other." *Nelson v. Heer*, 163 P.3d 420, 427 (Nev. 2007); *Ainsworth v. Combined Insurance Company of Am.*, 763 P.2d 673, 676 n.1 (1988), *cert. denied* 493 U.S. 958 (1989) (the covenant is "implied into every commercial contract."). Under Nevada law, even if there is no breach of contract, a plaintiff "may still be able to recover damages for breach of the implied covenant of good faith and fair dealing," under a contract law theory when "the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract . . .." *Hilton Hotels Corp. v. Butch Lewis Productions, Inc.*, 808 P.2d 919, 922 (Nev. 1991); *contra Nelson*, 163 P.3d at 427 ("Since Nelson bore no contractual duty to disclose the water damage, Nelson's omission did not constitute an arbitrary or unfair act that worked to Heer's disadvantage;" therefore, his claim for breach of implied covenant of good faith and fair dealing was insufficient as a matter of law.).

As discussed above, the defendants did not breach the performance bond. Therefore, the court must determine whether, although the defendants complied with the literal terms of the contract, they deliberately or intentionally hindered the performance of the contract. The record is devoid of any such evidence. Unlike in *Hilton*, where evidence in the record supported plaintiff's allegation that the defendants intentionally and purposefully undermined the contract "in a manner that [was] unfaithful to the purpose of the contract," and a trial was required, the facts here do not suggest a similar result. 808 P.2d at 922-23. Rather, as discussed above, it was plaintiffs that were in material breach of the performance bond by failing to adequately complete

13

its obligations under § 3.2. Accordingly, the court grants defendants' motion for summary judgment on plaintiffs' seventh cause of action.

### E. Defendants' first cause of action, breach of payment bond, is granted in part and denied in part. Accordingly, the corresponding claims for contractual breach of implied covenant of good faith and fair dealing, plaintiffs' sixth cause of action, and breach of the Construction Contract, plaintiffs' third cause of action are granted in part and denied in part.

"A 'payment bond' is an undertaking whereby a surety guarantees to the obligee that all bills for labor and materials contracted for and actually used by a contractor will be paid if the contractor defaults." 17 Am. Jur. 2d *Contractors' Bonds* § 1 (2019). Unlike the performance bond obligations, discussed above, "payment bonds are intended to ensure that *laborers* and *material suppliers* will be paid in the event of a default." *Id.* (emphasis added).

The payment bond provides in relevant part:

> **§ 2** If the Contractor promptly makes payment of all sums due to Claimants, and defends, indemnifies and holds harmless the Owner from claims, demands, liens or suits by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract, then the Surety and the Contractor shall have no obligation under this Bond.
>
> **§ 3** If there is no Owner Default under the Construction Contract, the Surety's obligation to the Owner under this Bond shall arise after the Owner has promptly notified the Contractor and the Surety (at the address described in Section 13) of claims, demands, liens or suits against the Owner or the Owner's property by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety.
>
> **§ 4** When the Owner has satisfied the conditions in Section 3, the Surety shall promptly and at the Surety's expense defend, indemnify and hold harmless the Owner against a duly tendered claim, demand, lien or suit.
>
> . . .
>
> **§ 5.1** Claimants, who do not have a direct contract with the Contractor,
>
> . . .
>
> **§ 5.2** Claimants, who are employed by or have a direct contract with the Contractor, have sent a Claim to the Surety (at the address described in Section 13).
>
> . . .

14

> **§ 16.2** Claimant. An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to Furnish labor, materials or equipment for use in the performance of the Construction Contract. The term Claimant also includes any individual or entity that has rightfully asserted a claim under an applicable mechanic's lien or similar statute against the real property upon which the Project is located. The intent of the Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the Construction Contract, architectural and engineering services required for performance of the work of the Contractor and the Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

ECF No. 71-4.

Plaintiffs' complaint raises several issues regarding breach of this payment bond by the Surety. *See* ECF No. 2, Ex. A. Plaintiffs argue that defendants are required to step in and defend Sonoma Springs against Ascent's mechanics lien. *Id.* ¶ 19(a). Plaintiffs also argue that defendants were required under the bond to pay off liens filed by JM Mechanical and Exclusive Landscape, but due to defendants' failure, plaintiffs were forced to pay these liens off themselves, a total of $27,218.78. *Id.* ¶ 34. The record also includes a Notice of Lien for $131,808.36 due to Donald Woo Construction brought by Progressive Services Corporation. ECF No. 2, Ex. A(8) & (9). The record provides that Ascent requested the lien be released and executed a Release of Lien Bond for $197,712.54 on August 15, 2016. *Id.* Correspondence between the parties indicates that Weigle Concrete also filed a lien against the property, but the Surety articulated, and plaintiffs have not refuted, that this lien has since been released. *Id.*, Ex. A(8).

First, the court disagrees with plaintiffs that the plain terms of the payment bond force defendants to step in and pay off a mechanics lien filed by the bond's principal, here Ascent, against the owner. Neither party cites to any case law and the court is likewise unaware of any that would support this reading of a payment bond. Neither can plaintiffs cite to any evidence that the parties intended the word "claimant" to include Ascent. *See Reno Club v. Young Inv. Co.*, 182 P.2d 1011, 1016 (Nev. 1947) ("In the absence of clear evidence of a different intention, words must be presumed to have been used in their ordinary sense, and given the meaning usually and ordinarily attributed to them.").

15

Further, a plain reading of the payment bond indicates that a "claimant," as defined in the bond, cannot be the principal. For example, reading § 5.2 of the payment bond as plaintiffs suggest would create the following: "[Contractor], who are employed by or have a direct contract with the Contractor, have sent a Claim to the Surety." Such a reading would lead to an absurd result of not only § 5.2, but also sections 2, 5.1, and 16.2. *See Young*, 182 P.2d at 1017 ("A contract should not be construed so as to lead to an absurd result," and "[a] contract should be given a reasonable and fair interpretation." (citations omitted)); *Royal Indem. Co., Inc. v. Special Serv. Supply Co.*, 413 P.2d 500, 502 (Nev. 1966) ("If we accept appellant's argument that materialmen's defaulted bills were not included in the bond, there appears no purpose for Royal expressly denying liability for prior materials . . ..").

Second, plaintiffs contend that they were forced to pay two subcontractors, JM Mechanical and Exclusive Landscape, after they filed liens against the property and the defendant failed to indemnify and hold plaintiffs harmless. Under the payment bond, if the Owner is not in default, the Surety's obligations arise when the Owner promptly notifies the Contractor and the Surety of the claim or lien against the property, and any defense to such claim or lien. ECF No. 71-4 § 3. As discussed above, it is a materially disputed fact whether the Owner was in default. Additionally, correspondence from the Surety's counsel to plaintiffs' counsel indicates that the Surety determined that the filing of liens against the project was not a default under the Construction Contract. ECF No. 2, Ex. A(8). Rather, it was the Surety's position that §§ 2.1.2, 15.2.8, and 9.10.2 of the Construction Contract *permit* the Surety to "bond off" the liens but do not *require* it to. *Id.* (emphasis added). The Surety then stated it was unable to take further action because it appeared to them that there was a legitimate dispute. *Id.*

The relevant provisions of the Construction Contract provide:

> **§ 2.1.2** The Owner shall furnish to the Contractor within fifteen days after receipt of a written request, information necessary and relevant for the Contractor to evaluate, given notice of or enforce mechanic's lien rights. Such information shall include a correct statement of the record legal title to the property on which the Project is located, usually referred to as the site, and the Owner's Interest therein.
>
> . . .

> **§ 9.10.2** Neither final payment nor any remaining retained percentage shall become due until the Contractor submits to the Architect (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered (less amounts withheld by Owner) have been paid or otherwise satisfied, (2) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner, (3) a written statement that the Contractor knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents, (4) consent of surety, if any, to final payment, and (5), if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner. If a Subcontractor refuses to furnish a release or waiver required by the Owner, the Contractor may furnish a bond satisfactory to the Owner to indemnify the Owner against such lien. If such lien remains unsatisfied after payments are made, the Contractor shall refund to the Owner all money that the Owner may be compelled to pay in discharging such lien, including all costs and reasonable attorneys' fees.
>
> . . .
>
> **§ 15.2.8** If a Claim relates to or is the subject of a mechanic's lien, the party asserting such Claims may proceed in accordance with applicable law to comply with the lien notice of filing deadlines.

ECF No. 75-1.

On plain reading of both the Construction Contract and the payment bond, the court agrees with plaintiffs that there is a legitimate material dispute as to whether the Surety was required to "bond off" the liens filed by the above noted subcontractors. The contract provides that "the Contractor *may* furnish a bond satisfactory to the Owner to indemnify the Owner against such lien." *Id.* § 9.10.2 (emphasis added). However, under the payment bond, when the Owner is in full compliance, "the Surety *shall* promptly and at the Surety's expense defend, indemnify and hold harmless the Owner against a duly tendered claim, demand, lien, or suit. ECF No. 71-4 § 4 (emphasis added). Based on the conflicting language, there is a material dispute of fact and summary judgment is inappropriate.

Therefore, because the reasonable interpretation of the payment bond is that "Claimant" does not include the principal under the bond, the court grants defendants' motion for summary judgment on this portion of plaintiffs' first cause of action, breach of payment bond. However, plaintiffs may proceed under the first and third causes of action regarding whether the Surety

breached its contract under the payment bond and incorporated Construction Contract for refusing to "bond off" the liens filed by the subcontractors. Because there is a legitimate dispute as to whether the Surety was required to bond off these lien holders, whether the failure to do so would constitute a contractual breach of the covenant of good faith and fair dealing is also disputed. Therefore, the court denies defendants' motion for summary judgment as to plaintiffs' sixth cause of action cause of action to the extent it is applicable in this limited context.

### F. The court grants defendants' motion for summary judgment as to plaintiffs' eleventh and twelfth causes of action for Fraudulent or Intentional and Negligent Misrepresentation.

Under Nevada law, "[i]ntentional misrepresentation is established by three factors: (1) a false representation that is made with either knowledge or belief that it is false or without a sufficient foundation, (2) and intent to induce another's reliance, and (3) damages that result from this reliance." *Nelson*, 163 P.3d at 426 (citing *Collins v. Burns*, 741 P.2d 819, 821 (Nev. 1987)). "[T]he damage alleged must be proximately caused by reliance on the original misrepresentation or omission." *Id.* Similarly, to succeed on a claim for negligent misrepresentation, the plaintiff must prove "(1) a false representation made by defendant; (2) the representation was made in the course of the defendant's business; (3) the representation was for the guidance of others in their business transactions; (4) plaintiff's justifiable reliance upon the misrepresentation; (5) the reliance resulted in pecuniary loss to plaintiff; and (6) defendant failed to exercise reasonable care or competence in obtaining or communicating the information." *McDonald v. Palacios*, Case No. 2:09-cv-01470-MMD-PAL, 2016 WL 5346067, at *14 (D. Nev. Sept. 23, 2016).

Plaintiffs argue that "Defendants knew, at the time Plaintiffs entered into the Agreement, that it could not fulfill and was not going to attempt to fulfill its own statutory obligations." ECF No. 71 at 27. However, the record is devoid of any evidence of this assertion. Further, plaintiffs fail to cite to and the court has failed to find any evidence in the record that supports either a claim for intentional or negligent misrepresentation. Accordingly, the court grants defendants' motion for summary judgment on plaintiffs' eleventh and twelfth causes of action.

///

**G. The court grants defendants' motion for summary judgment as to plaintiffs' thirteenth cause of action for unjust enrichment.**

"An action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement." *LeasePartners Corp. v. Brooks Trust*, 942 P.2d 182, 187 (Nev. 1997). Defendants argue that because there is an express contract, the payment and performance bonds, the claim for unjust enrichment must fail as a matter of law. The court agrees and finds that the bonds are an express contract between Fidelity and plaintiffs; therefore, any claim for unjust enrichment as to Fidelity fails as a matter of law.

Plaintiffs argue that there is a dispute as to material fact as to whether Zurich was a party to the bonds, and therefore, the claims for unjust enrichment must survive, even if only against Zurich. Defendants, in contrast, argue that even though Zurich was not a party to the bonds, the claim must fail because the record does not show that (1) plaintiffs conferred a specific benefit on Zurich, (2) Zurich appreciated no benefit, and (3) that Zurich accepted and retained no specific benefit. *See Unionamerica Mortg. And Equity Trust v. McDonald*, 626 P.2d 1272, 1273 (Nev. 1981) (quoting *Dass v. Epplen*, 424 P.2d 779, 780 (Colo. 1967) (articulating the elements of unjust enrichment). Defendants argue that because Fidelity, not Zurich issued the bond, it was Fidelity that was conferred the benefit of and appreciated the bond premiums.

First, the court is not convinced that Zurich was not a party to the contract. The record provides that on the cover page of the payment bond, under "Surety," the mailing address for notices and claims is listed as "Zurich North America Claims." Additionally, attached to the performance bond is a Power of Attorney that lists the same Vice President for both Zurich American Insurance Company and Fidelity and Deposit Company of Maryland. From this record, the court could find that Zurich was also a party to the express contract; and accordingly, any claim for unjust enrichment as to Zurich would also fail as a matter of law. However, even if Zurich was not a party to the contract, plaintiffs have failed to point to any evidence in the record that shows premiums paid to Fidelity under the bonds were conferred on or appreciated by

Zurich. The court therefore grants defendants' motion for summary judgment on plaintiffs' thirteenth cause of action.

### IV. CONCLUSION

IT IS THEREFORE ORDERED that defendants' motion for summary judgment (ECF No. 60) is **GRANTED in part** and **DENIED in part** in accordance with this Order. Defendants' motion as to plaintiffs' first and third causes of action is granted in part and denied in part. Defendants' motion as to plaintiffs' sixth cause of action is denied. Defendants' motion as to plaintiffs' second, fourth, fifth, seventh, eighth, ninth, tenth, eleventh, twelfth, and thirteenth claims is granted.

IT IS FURTHER ORDERED that that parties shall submit a proposed joint pretrial order in compliance with Local Rules 16-3 and 16-4 within 45 days of the entry of of this order.

IT IS SO ORDERED.

DATED this 14th day of August, 2019.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE